[Civ. No. 16736. First Dist., Div. One. May 14, 1956.]

LEON OPPENHEIMER et al., Respondents, v. LEROY
N. MINKS et al., Appellants.

Paul D. Morse for Appellants.

Frisbie & Hoogs for Respondents.

BRAY, J.—Trial was had upon plaintiffs' fourth amended complaint, containing two counts: (1) for damages in the sum of $3,018.56 for alleged defects in the construction of certain buildings erected by defendant Leroy N. Minks for plaintiffs; (2) a common count for moneys had and received in the sum of $6,983.64. During the trial, the court, over defendants' objection, permitted plaintiffs to amend the first count to conform to the proof by decreasing the amount alleged to be due and prayed for to $2,574 and the second count by increasing the amount alleged to be due and prayed for to $9,923.27. Defendants appeal from a judgment on a jury verdict in the sum total of the amended amounts prayed for in the two causes of action.

## QUESTIONS PRESENTED

1. Was the cause of action changed either by proof or amendment to conform to proof, and was there a variance from the bill of particulars?

2. Instructions.

3. Should the issue of defendants' partnership have been submitted to the jury?

4. Alleged misconduct of court.

5. Court's refusal to admit "Dissolution Agreement."

6. Court's refusal to order plaintiffs to produce their own accountant's report.

## FACTS

The parties had been close friends over a period of years. Defendant Leroy Minks had made investments, managed property and made collections for plaintiffs during this time. Defendants Leroy and Evelyn were husband and wife. Both were licensed separately as real estate brokers.* Over a period of several months plaintiffs and defendants discussed

---

*Practically all the transactions were between plaintiffs and Leroy. Evelyn was charged with being a partner with Leroy in these transactions. Unless otherwise noted "defendant" herein refers to Leroy.

the feasibility of constructing some apartment houses, with parking spaces or garages on real property belonging to plaintiffs. It was originally planned to build eight apartments at a cost of about $40,000. There was a conflict in the evidence as to whether there was an oral contract between the parties, and if so, whether the apartments were to be constructed for a fixed sum or on a cost-plus basis. On March 5, 1951, plaintiffs borrowed $25,000 from a bank and deposited it and approximately $15,000 they had, in a special fund in the bank, called the ''Oppenheimer Building Fund'' on which checks for building expenses were to be drawn by defendant. A building permit was obtained and the work started. Up to this point all understandings were oral. A few days later the bank requested that defendant supply it with a statement of the transaction. Defendant complied with a statement dated March 26th, in which he agreed to erect eight units shown on accompanying blueprints for $37,500 plus proposed garages to cost $2,500, making a total of $40,000. Plaintiffs were to pay for additional work, if any, and ''whatever amount of said forty thousand dollars is left after said building is completed, said sum shall be the property'' of plaintiffs. Defendant for his services was to receive $1,500 payable when plaintiffs deemed the money was earned. Some question arose as to whether steel and good building material could be obtained. When it was found that it could, the parties decided to build four stores in the place of the garages. The evidence is conflicting as to what the stores were to cost. Plaintiffs testified defendant told them the stores' total cost would be between $4,000 and $6,000. Defendant testified that he estimated the stores would cost $4,000 to $6,000 per unit. However, he told the Oakland Building Department that all stores would total $6,000. He testified that he said this to keep the cost of the building permit low and to permit lower tax assessment on the property. Because of the construction of the stores, further capital was needed, so plaintiffs borrowed an additional $10,000. Plaintiff Josephine testified that $6,000 of this was for the stores and the remaining $4,000 for remodeling other property of plaintiffs. About $11,000 more which came from plaintiffs' income property plus an additional $1,000 was put in the fund. Plaintiffs testified that defendant was not authorized to spend this money. Certain changes were made in the building plans which added to the original estimated cost of the building. In October or November, when the work was substantially

completed, plaintiffs paid defendant his $1,500 fee, and also paid a contractor who was in actual supervison of the work $1,000. Defendant obtained tenants and managed the property until May or June, 1952. Plaintiffs requested and received from defendant (the exact date of receipt is in conflict) a financial statement dated February 13, 1952.

### 1. *Was Cause of Action Changed?*

■ Defendants contend that the action was commenced and partially tried on the theory that plaintiffs were suing in conversion, claiming that defendants embezzled the $6,983.64 shown in the bill of particulars and then during the balance of the trial changed their theory to one of breach of contract, and that the trial court in permitting the amendment of the amount of the complaint recognized and permitted such change of theory. Plaintiffs deny this charge. A thorough study of the transcript fails to support defendants' contention. At the opening of the trial plaintiffs stated that they would prove that defendant in writing agreed to construct an apartment building according to plans and specifications for $37,500 plus an additional $2,500 for certain garages and for his services defendant was to receive $1,500; that shortly after the building was started it was orally agreed between the parties that stores would be built instead of garages and that plaintiffs would pay the cost of the construction of the stores. Plaintiffs then stated that the Oppenheimer Building Fund was created, into which plaintiffs put certain moneys, and in which defendant placed collections made by him for plaintiffs, and that taking into consideration the agreed price of the building, the extra cost for the stores and other items and compensation to defendant, and deducting the total from the entire amount of the building fund, $6,900 plus ''disappeared in the process and is no longer available, paid out of this building fund and disappeared into thin air . . . He had a contract for $40,000 plus legitimate extras which we will show you—plus the stores—the difference between that and the amount of money the man had available to him given to him by my clients is what we will ask you to return to them . . .'' Defendants' opening statement claimed that the agreement between the parties was oral and was to the effect that defendant would supervise the construction of the building for a fee of $1,500 and the business of collecting rents from the tenants who might occupy

it* and that plaintiffs would pay for the cost, that the $6,900 plus collected by defendant went into the Oppenheimer fund and was used to build the building. From the opening statements and as the case proceeded it clearly appeared that the main issue between the parties was whether the agreement between the parties for the construction of the building was for a fixed price of $40,000 or whether it was for cost-plus. The $6,983.64 went into the sum of $62,847.22, the total sum in the fund. The total amount of the fund was expended by defendant in the construction of the building and the stores. This he was entitled to do if the agreement was a cost-plus one. He was not entitled to use all of the fund if the contract was for an agreed price. When the expenditures from the fund to which defendant was only entitled if the agreement were a fixed price one (and the jury so found it to be) were deducted from the total amount of the fund used by defendant from the fund, there was a difference of $9,923.27, some $2,000 more than represented by the collections referred to in the bill of particulars. We see no variance in the cause of action between that pleaded in the common count and the theory upon which the case was started, on the one hand, and the theory upon which recovery was had, on the other. Plaintiffs were suing for moneys had and received. Their bill of particulars showed that they set forth moneys received by defendant for plaintiffs for which they claimed he did not account. In attempting to account for it, he showed that the moneys went into the building fund and from it were used in the construction work. But plaintiffs then countered by showing that he had no right to use those moneys for that purpose as he had agreed to build the building for a fixed amount, in other words, that he had used the money without their authority. Thus, plaintiffs were not suing on a breach of contract. They were suing for moneys held by defendant in trust for them and improperly expended. Authorities such as *Cincotta* v. *Catania*, 61 Cal.App. 38 [214 P. 451], holding that under a cause of action for money had and received a recovery for breach of contract cannot be had, are not in point. There was no variance from the bill of particulars except as to amount. It appeared from the proof that, in addition to the moneys mentioned in the bill of particulars, defendant had unauthorizedly used other moneys in the trust

---

*Defendant cross-complained for damages for plaintiffs' breach of this agreement.

fund. The court properly permitted plaintiffs to amend their complaint to allege the true amount which the evidence showed defendant had received for plaintiffs' use and benefit.* No objection was made to the amendment on the ground of difference between these amounts and those shown in the bill of particulars. The objection was that by changing the amount in the complaint the cause of action was changed.

2. *Instructions.*

Defendants complain of a number of the instructions given. Generally, it is contended that the criticized instructions are determinations by the court as to what the agreements of the parties and the terms thereof were; as to what the jury should determine other controverted facts to be; that the court instructed the jury to find against defendants' theory that the building agreement was on a cost-plus basis; and that in a particular instruction the court failed to include all elements of the subject. We find no error in the instructions. Throughout, defendants take phrases from an instruction with complete disregard of the context and of the fact that instructions must be considered as a whole, and attempt to read into them a different meaning than they actually bear. Likewise, they completely ignore the fact that elements claimed to be omitted from a particular instruction are either in the instruction or clearly appear elsewhere. Defendants contend that certain instructions change plaintiffs' cause of action from conversion to breach of contract. The instructions actually bear no such construction. The substance of certain instructions offered by defendants and not given, where proper, were given in other instructions.

When the construction work started defendant and one Milarch had a partnership contractor's license. Defendant and Evelyn as individuals and defendant and Evelyn as partners had no license. Before the building was completed the Minks-Milarch license expired. The court refused to give an instruction offered by defendants of the type approved in *Comet Theatre Enterprises* v. *Cartwright,* 195 F.2d 80. However, the instruction is not applicable here. In the Comet case, the plaintiffs had paid an unlicensed contractor the agreed amount for his services and was seeking to recover the payment because the contractor was unlicensed. The court

---

*The only amendment to the second cause of action was changing the figures $6,983.64 to $9,923.27. The figures in the first cause of action were reduced. Defendants do not complain of this amendment.

said that the plaintiffs could not recover the amount paid for the services and keep the benefits of them too. In this case, the Oppenheimers are not seeking to recover the amount paid to the Minkses for the agreed construction price; they are seeking to recover the amount of their money that he used without authority.

Defendants offered an instruction on fraud. As fraud was not an issue the instruction was properly refused.

Defendants complain that there was no evidence of partnership between defendant and Evelyn and hence instructions leaving that issue to the jury were erroneous.

### 3. *Partnership of Defendants.*

Defendants also claim on this same ground that the court erred in refusing to direct a verdict in Evelyn's favor. The evidence on this subject follows. The letter signed by defendant agreeing to construct the building was on the letterhead of the business defendant and Evelyn were conducting at that time. Evelyn testified that she and her husband operated and owned the real estate business together under the names Minks Company and L. N. Minks Company. She testified that she was not a contractor, that her husband was and that his building activities were run out of the same office and with the same office organization as the real estate business. When asked if there was any separation between the businesses she replied "Not too much." Then when asked "Was there any?" she replied, "Well, I suppose there was. *I didn't ever stop to think of it.*" (Emphasis added.) "We used them both . . . We didn't discriminate between the two." To the court's question "What was it, a partnership or corporation, or what?" she replied, "We just owned the business and we weren't too particular." Defendant testified that Minks Company was fictitiously registered to do business under his wife's name and that L. N. Minks Company was registered to do business "as myself," that "in the office we didn't even remember which was which." When asked if other than registration there was any difference between the companies he said, "Well, I wouldn't know." He then testified "our business is conducted mutually together . . ." They used one set of books and operated their business as a unit. Exhibit C, a check to A. R. Peterson and Sons marked "Paid in Full on Oppenheimer Job 10016 MacArthur Blvd." (the apartment building location) bears the printed heading "E. S. Minks—L. N. Minks." Plain-

tiffs' exhibit 5—defendant's accounting for the receipts and expenditures out of the "Oppenheimer Building Fund"—is on the letterheads of "L. N. Minks Co." The mere fact that the contract with plaintiffs was signed only by defendant is not conclusive that he was not acting for the partnership.

While there was no direct evidence of an oral or a written agreement of partnership between the defendants in the contracting business, the evidence above set forth was sufficient to raise an inference that such a partnership existed. Therefore the court properly left the determination of that issue to the jury and properly denied the motion for directed verdict.

4. *Alleged Misconduct of Court.*

Defendants specify 48 instances in which they claim the trial court unduly interfered with their examination and cross-examination of witnesses. Defendants specify 17 instances in which they claim the court by its rulings and comments improperly created an unfavorable opinion of defendant. We have examined each instance and fail to find that they support defendants' contention. They are principally rulings adverse to defendants on the form of questions (asking for the conclusion of the witness, basing a question upon a fact not in evidence, not proper cross-examination, etc.). In most instances the court was right. In the few where the question should have been permitted, changes in the form of the question adduced the information sought. The 17 instances of comment on rulings by the judge were likewise proper. Nor do we find anything wrong in the fact that the court in some of the instances interrogated the witnesses. When done, it obviously was done to make the witness' statements clearer. We cannot read into the instances any desire upon the part of the court to injure defendants. Of course, the answers were unfavorable to defendants, but that fact would not deprive the court of its power to interrogate a witness when deemed necessary to make the situation more clear. The court fully instructed that the jury must not be influenced by any remarks of the court that might appear to favor one party or the other, and that if some statement made by the court indicated that it had an opinion on the merits of the case, the jury must disregard the remark. While on a limited number of occasions the court seemed a bit petulant, we fail to find any indication of injury to defendants or failure to accord defendants a fair trial.

4. *Dissolution Agreement.*

██ After the completion of the building and before this action was commenced, defendants and plaintiffs entered into a "Dissolution Agreement" in which the parties divided various properties they had owned together and which purported to settle all financial affairs between them relating to certain specified properties and transactions. (The apartment building was not mentioned.) There is a clause to the effect that as to any other holdings owned by plaintiffs which defendants are then managing, defendants shall "have no further interest therein or thereto morally, commercially or legally" if "at any time . . . [they] may be taken over by" plaintiffs. The court refused to admit this agreement on the ground that it did not deal with the apartment building. At the time it was executed defendants were still collecting the rents for plaintiffs on that building. It was not until thereafter that plaintiffs discharged defendants as their agent in this respect. Defendants claim that it discredited plaintiffs' present claim. We fail to see that it has any bearing on this case. The court properly rejected it.

6. *Accountant's Report.*

██ Plaintiffs employed an accountant to go over defendants' records. Defendants demanded that the accountant's report to plaintiffs be produced in court and that they be permitted to examine it. The court refused to order its production. Defendants have cited no authority requiring it. It was a confidential report between the accountant and plaintiffs and a part of the preparation for trial by plaintiffs and their counsel. We see no error here.

Defendants, using their own version of the evidence in the case, contend that the verdict results in substantial injustice to defendants in unjustly enriching plaintiffs at defendants' expense. The answer to their contention is that the jury on substantial evidence found against their contention.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied June 13, 1956, and appellants' petition for a hearing by the Supreme Court was denied July 11, 1956.